Napier Furniture Co., Inc., et al. * v. Commissioner. Napier Furniture Co. v. Commissioner
Docket Nos. 88904-88906, 89414, 89415. .
United States Tax Court
T.C. Memo 1963-124; 1963 Tax Ct. Memo LEXIS 220; 22 T.C.M. (CCH) 575; T.C.M. (RIA) 63124; May 2, 1963
Merle H. Miller, Esq., 10th Floor, 111 Monument Circle, Indianapolis, Ind., and Alan H. Lobley, Esq., for petitioners in Docket Nos. 88904, 88905, and 88906. Harry P. Dees, Esq., for petitioners in Docket Nos. 89414 and 89415. Ferd J. Lotz, Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined the following deficiencies and additions in petitioners' income tax: Addition to
Tax Sec. 294
Docket
Taxable
(d)(2), I.R.C.
Number
Petitioner
Year
Deficiency
1939
88904
Napier Furniture Co., Inc.
1956
$ 8,655.00
1957
10,407.38
88905
Huntingburg Consolidated Industries, Inc.
1956 [1]
1,562.47
1957 [2]
2,400.73
88906
Huntingburg Furniture Company, Inc.
1953
46,104.34
1954
28,128.70
1955
44,423.38
1956
73,826.81
1957
62,903.68
89414
Charles W. Blemker and Mary Lee Blemker
1953
644.74
$103.36
508.42 [3]
30.51 [3]
1954
2,212.72
2,450.96 [3]
1957
1,995.98
5,599.39 [3]
89415
John J. Stimson and Margaret E. Stimson
1953
239.99
723.09 [3]
1956
2,805.15
10,732.65 [3]
1957
1,279.09
6,111.57 [3]
*222 There have been certain agreements, and the remaining issues are as follows: (1) Whether income derived from certain trucking operations is taxable to petitioner Huntingburg Furniture Company, Inc., or to partners of certain alleged partnerships purportedly formed for the purpose of leasing certain items to the corporation; (2) The useful lives of tractors and trailers used in certain trucking operations; (3) Whether certain payments made by petitioner Huntingburg Furniture Company, Inc., to petitioner Huntingburg Consolidated Industries, Inc., were deductible by the former and by the trucking venture, and whether said payments were taxable to the latter or were capital contributions; (4) The net operating loss of petitioner Huntingburg Furniture Company, Inc., for the taxable year 1953; (5) Whether certain payments made by petitioner Napier Furniture Co., Inc., to petitioner Huntingburg Furniture Company, Inc., constituted dividends or repayment of borrowed funds; (6) Whether *223 a major purpose in the formation of petitioner Napier Furniture Co., Inc., was to obtain a surtax exemption; and (7) Whether petitioners Charles W. Blemker and John J. Stimson are entitled to certain travel and entertainment expense deductions. Findings of Fact Some of the facts have been stipulated and are so found. Petitioner Huntingburg Furniture Company, Inc. (hereinafter called Furniture Co.), was incorporated in 1911 under the laws of the State of Indiana. During the taxable years 1951 through 1957, it filed its corporate income tax returns on an accrual basis with the district director of internal revenue at Indianapolis, Indiana. Petitioner Napier Furniture Co., Inc. (hereinafter sometimes called Napier), was incorporated under the laws of the State of Alabama on March 13, 1956, to be retroactive to January 1, 1956. It filed its corporate income tax returns for the taxable years 1956 and 1957 on an accrual basis with the district director of internal revenue at Indianapolis, Indiana. Petitioner Huntingburg Consolidated Industries, Inc. (hereinafter called Consolidated), was incorporated in 1955 under the laws of the State of Indiana. It filed its corporate income *224 tax returns for the taxable years 1956 and 1957 with the district director of internal revenue at Indianapolis, Indiana. Petitioners Charles W. Blemker (hereinafter called Blemker) and Mary Lee Blemker are husband and wife who at all times material hereto resided in Huntingburg, Indiana. The filed joint Federal income tax returns on the cash basis for the calendar years 1953, 1954, and 1957 with the district director of internal revenue at Indianapolis, Indiana. Petitioners John J. Stimson (hereinafter called Stimson) and Margaret E. Stimson are husband and wife who at all times material hereto resided in Dubois County, Indiana, near the city of Huntingburg, Indiana. They filed joint Federal income tax returns on the cash basis for the taxable years 1953, 1956, and 1957 with the district director of internal revenue at Indianapolis, Indiana. The ownership of the common stock of Furniture Co. at all relevant times was as follows: $10.00 [4] Par
December 31
1953
1954
1955
1956
1957
R. H. McMurtrie
34,350
34,350
35,310
35,310
35,310
Marion McMurtrie
3,900
3,900
3,900
3,900
3,900
Alice Gabriel
10,800
10,800
10,800
10,800
10,800
John J. Stimson
4,650
4,650
4,650
4,650
4,650
Frances Lichtenwalter
3,900
3,900
3,900
3,900
3,900
Harriett Wells
3,900
3,900
3,900
3,900
3,900
Alvin Eulenstein
1,500
1,500
1,500
C. E. Blemker
1,500
1,500
1,500
1,500
1,500
Margaret Gatling
960
960
Matthew Rothert
300
300
300
300
300
Stephen Gould
1,400
1,400
1,400
1,400
1,400
Edwin Gould
1,400
1,400
1,400
1,400
1,400
William Gould
1,400
1,400
1,400
1,400
1,400
Nancy Jones
1,634
1,634
934
934
934
Nancy Molloy
570
570
570
570
570
Stanley Burton Covert. Jr.
570
570
570
Stanley B. Covert. Sr.
339
339
339
339
339
Dorothy Covert
509
509
859
859
859
Suzanne Clauser
570
570
570
570
570
Leonard S. Phillips
339
339
339
339
Elizabeth Jones Phillips
509
509
859
859
859
Margaret Mann
1,500
1,500
Benjamin G. Robertson
285
285
E. L. Wells
285
285
Huntingburg Furniture Co. Retirement
Profit Sharing Trust
339
Total Shares Outstanding
75,000
75,000
75,000
75,000
75,000
*225 R. H. McMurtrie (hereinafter referred to as McMurtrie) is the husband of Marion McMurtrie. Alice Gabriel, Frances Lichtenwalter, Harriett Wells, Stephen Gould, Edwin Gould, William Gould, and E. L. Wells are related to Marion McMurtrie either by blood or marriage. McMurtrie has been in the furniture business and has been associated with Furniture Co. since 1918 or 1919. He became its president in 1929 and has remained president throughout the times material hereto. Facts Concerning Trucking Operations Furniture Co. was at all times material hereto a manufacturer of wooden household furniture in the medium and lower price ranges. Prior to 1941, a man named Jones had been conducting the hauling of Furniture Co.'s merchandise from the factory to the freight depot. When Jones' business failed, Harry Leland (hereinafter called Leland), a Jones driver, sought to conduct this hauling on his own. Lacking the funds to purchase some of Jones' equipment, Leland approached McMurtrie. The two men entered into a partnership to conduct the hauling, profits to be divided equally. McMurtrie supplied *226 the capital, receiving a note therefor from Leland, and Leland provided the active services. In 1949, Leland withdrew from the trucking operation and turned over to McMurtrie the two tractor-trailer units that were then used by the operation. At this time, Stimson was McMurtrie's assistant with the title of sales manager, and Blemker was Stimson's assistant. The primary duty of Blemker was to develop a dealer program whereby Furniture Co. would sell to smaller dealers in smaller quantities. Furniture Co. had previously sold primarily to large purchasers, such as Montgomery Ward, "jobbers," and other mail order firms. It was felt that Furniture Co. should also sell directly to smaller dealers. Rapid and inexpensive delivery would be a very important aspect of the dealer program. Rapid delivery was desirable so that the dealers would not have to carry a large inventory. An inexpensive method was appropriate because Furniture Co. sold inexpensive furniture and shipping costs were an important factor in the over-all price to the dealer. It was believed that these ends could best be attained by truck delivery with Furniture Co. operating its own trucks. If Furniture Co. utilized its *227 own trucks, the furniture could be shipped uncrated. At that time, conventional truck lines required crating. Many lines also prefer not to ship furniture. Stimson and Blemker were enthusiastic about inaugurating the dealer program and the truck transportation. A dealer program was instituted, but the transition period proved unsatisfactory from the standpoint of profits. Stimson and Blemker tried to convince McMurtrie to start a delivery operation but McMurtrie stated that the company was not in a position to make the requisite capital investment. A short time later, and still in 1949, McMurtrie approached Stimson, Blemker, and another employee of Furniture Co., Robert Seeberger (hereinafter called Seeberger), offering to contribute the two tractor-trailer units he received in the dissolution of his partnership with Leland, if the others would contribute sufficient funds to buy a third unit. This method of commencing the trucking aspect of the new dealer program was used because the corporation was short of working capital and was not in a position to invest in trucking units. McMurtrie approached Stimson, Blemker and Seeberger because they had shown interest in the delivery operation. *228 McMurtrie hoped to depend upon these individuals to develop Furniture Co. and he also did not believe that anyone outside the company would be interested in the trucking operation. These four men agreed orally to enter upon a trucking venture. They agreed that costs would not exceed those which a conventional trucking line would impose. The price charged by the venture was to be equal to the crating costs which would otherwise have been incurred. In addition, certain additional charges would be made for deliveries beyond a 300-mile radius. Pursuant to this understanding, an account in the name of Huntingburg Trucking Company was opened in 1949. Blemker, Stimson and Seeberger each paid $2,400 to Furniture Co., which payment was entered in this account. On March 21, 1949, McMurtrie transferred the title of the two units he owned from the aforementioned operation with Leland, to Furniture Co. At the same time, McMurtrie paid to Huntingburg Trucking Company the sum of $246.50. The book value of the units so transferred was $3,682.07. McMurtrie was then credited on this account in the sum of $3,928.57. McMurtrie received a 2/5ths interest in the venture, while the others each received *229 a 1/5th interest. The units which were initially owned by McMurtrie and Leland were titled in the name of Furniture Co. Titling the units in the name of Furniture Co. alleviated franchise difficulties. In the purchase of new units it was simpler for Furniture Co. to acquire credit than the venturers. In February of 1949, [5] one of these units was traded in on a new unit. [6] The purchase price over the trade-in value was charged to this account. The new unit was titled in the name of Furniture Co. In 1949, Furniture Co. operated these trucks in the delivery of its furniture to its customers. It paid all expenses arising from the operation and use of said trucks including taxes and license fees on the equipment, but all of such expenses including taxes and license fees were charged to the Huntingburg Trucking Company account. In 1949, Furniture Co. used this equipment to deliver furniture to its customers. Leland managed this operation. Furniture Co. credited the Huntingburg Trucking Company account with an amount equal to the material cost it would have incurred in packing the furniture for *230 shipment by common carrier. In addition thereto, Furniture Co. charged its customers a set rate for shipments in excess of 300 miles from Huntingburg, Indiana. All amounts received by Furniture Co. for such shipments in excess of 300 miles were credited to the Huntingburg Trucking Company account. During the year 1949, Furniture Co. also kept an account for Huntingburg Trucking Company entitled Trucking Depreciation Reserve. The trucks used were depreciated to this account, and the depreciation was charged to the Huntingburg Trucking Company account. At the end of 1949, the excess of income over expense and depreciation from the operation of the trucks was calculated. One-half of this amount was credited to the account of Leland. The other one-half was credited to an account on the books of Furniture Co. entitled Profit Account - Huntingburg Trucking. Two-fifths of the Profit Account - Huntingburg Trucking was then credited to the account of McMurtrie. The remaining three-fifths was credited equally to the accounts of Stimson, Blemker and Seeberger. In 1950, a separate bank account in the name of Huntingburg Trucking Company was opened with the First National Bank of Huntingburg. *231 Furniture Co. wrote a check to Huntingburg Trucking Company for the balance in the Huntingburg Trucking Company account and the trucking depreciation reserve account at the end of February 1950. That check was then deposited in the First National Bank of Huntingburg in the Huntingburg Trucking Company account. The trucking operation continued in the same manner as in 1949 and was again managed by Leland. Furniture Co. paid all of the expenses of the operation and charged all such expenses to Huntingburg Trucking Company. Furniture Co. would also pay to Huntingburg Trucking Company an amount equal to the material cost Furniture Co. would have incurred in packing the furniture for shipment by common carrier. In addition thereto, Huntingburg Trucking Company received a fixed rate for all deliveries made beyond a 300 mile radius of Huntingburg. At the end of each month, Furniture Co. and Huntingburg Trucking Company would settle their accounts and pay over whatever balances might be due. After the profit of Huntingburg Trucking Company for the year 1950 had been calculated, one-half of it was paid to Leland and the remaining profit distributed to McMurtrie, Stimson, Blemker and Seeberger *232 in the same proportion as it had been in 1949. In 1951, the bank account of Huntingburg Trucking Company at the First National Bank of Huntingburg was closed and its balance was paid to Furniture Co. Huntingburg Trucking Company was credited with that balance. After the year 1950, Leland was no longer involved with the trucking operation. During the year 1951, the books of Huntingburg Trucking Company were kept by Furniture Co. All expenses and depreciation were charged to Huntingburg Trucking Company and all revenue from material cost savings and rates for distances in excess of 300 miles were credited to Huntingburg Trucking Company. At the end of the year, two-fifths of the profits were credited to McMurtrie and the remaining three-fifths were credited equally to Blemker, Seeberger and Stimson. In 1952, the trucking operation was carried out in the same manner as in 1951. In December 1950, Seeberger was recalled to active duty with the Army. He continued to receive his allocable portion of the trucking operation profit until 1952. In 1952, Seeberger decided not to return to Furniture Co., and his partners bought his equity in the Huntingburg Trucking operation with a check drawn *233 by Furniture Co. in the amount of $2,155.71. The profits from Huntingburg Trucking Company for 1952 were then credited 7/15ths to McMurtrie, 4/15ths to Stimson, and 4/15ths to Blemker. The trucking operations continued in 1953 in the same manner they had in 1952 with one exception. In 1953, one of the divisions of Furniture Co. began selling all its furniture "f.o.b." Huntingburg. That division published a printed price list for uncartoned furniture f.o.b. Huntingburg and listed the rates by the piece that the dealer would be required to pay for truck delivery, and these truck charges were made a part of the invoice of the manufacturing division submitted to the customer. Upon payment of the invoice, the shipping charge would then be credited to Huntingburg Trucking Company. During the years 1954 and 1955, more divisions of Furniture Co. began shipping f.o.b. Huntingburg in accordance with a published price list so that by the end of 1955, all shipments were in accordance with such a schedule. Operations for the year 1954 and 1955 were carried out in the same manner as they had been during the year 1953. During the year 1956, the Huntingburg Trucking Company again opened a *234 separate bank account with the First National Bank of Huntingburg. A separate set of books for the trucking operation was then maintained by Furniture Co. The operation was conducted by Furniture Co. from a separate office. During the relevant years, additional units were purchased. The funds were derived from surpluses in the trucking accounts and, at times, from contributions by the venturers. The number of tractors and trailers used by Furniture Co. was as follows: Year
Tractors
Trailers
1949
3
3
1950
3
3
1951
3
3
1952
3
3
1953
4
3
1954
5
6
1955
10
11
1956
13
14
1957
14 *
16
Until 1957, Furniture Co. kept the books and records by which it was determined how much the individuals were to receive from the trucking operation. At the close of each accounting period, the expenses and revenues of the trucking venture were taken off Furniture Co.'s books and credited to the personal accounts of the individuals. These accounts were debited when new equipment was purchased. During the period *235 material hereto, the trucking equipment was not listed as an asset of Furniture Co. and it did not appear in formal financial statements of Furniture Co., including those used by Furniture Co. in seeking credit from The Louisville Trust Company. No collision insurance was carried on any of the equipment operated by Furniture Co. and any charges for repair of equipment was charged to the Huntingburg Trucking Company account. Huntingburg Trucking Company carried liability insurance on this operation. An account for Dothan Trucking Equipment (hereinafter called Dothan Trucking) was opened in 1949. At that time, Blemker, McMurtrie, Seeberger, and Stimson each paid $1,200 to Furniture Co. These payments were credited to this account. In March 1950, one R. Egbert similarly paid $1,200 and had it credited to this account. In 1950, Furniture Co. purchased one tractor-trailer unit and charged the cost thereof to the Dothan Trucking account. The operation of Dothan Trucking was carried on in the same manner as Huntingburg Trucking Company. The books were kept in the same manner and all the expenses of the trucking operation including taxes and license fees were charged against Dothan Trucking. *236 The Dothan equipment was used to carry the furniture of the plant of Furniture Co. at Dothan, Alabama, and subsequently for Napier. The profits from the operation of Dothan Trucking were divided equally between Stimson, Blemker, Seeberger, McMurtrie and R. Egbert until 1952. In 1952 Seeberger left the venture and was paid $1,373.21 for his equity therein. For and after 1952, the profits were divided equally between the remaining four individuals. The number of tractors and trailers used by Dothan Trucking was as follows: Year
Tractors
Trailers
1950
2
1
1951
2
2
1952
2
2
1953
3
3
1954
5
6
1955
7
8
1956
9
10
1957
10
11
No collision insurance was carried on any of the equipment operated by Furniture Co. or Napier from the plant at Dothan, Alabama. Any charges for repair for damage to equipment were charged to the Dothan Trucking Account. Furniture Co. and Napier carried liability insurance on their operation of the trucks. During the taxable years in question, no written agreement existed between Seeberger, Blemker, Stimson and McMurtrie, or any of them, for the operation of trucks from Huntingburg, Indiana, by Furniture Co. During *237 the same period, there were no written agreements between Seeberger, Blemker, Stimson, McMurtrie and R. Egbert, or any of them, for the operation of trucks by Furniture Co. and Napier from Dothan, Alabama. During the taxable years in question, no written lease agreement was in existence between Furniture Co. and Seeberger, Blemker, Stimson, and McMurtrie, or any of them. During the same period, no written lease agreement was in existence between Furniture Co. and/or Napier and Seeberger, Blemker, Stimson, McMurtrie and R. Egbert, or any of them. The trucks in question were not operated by Huntingburg Trucking Company or by Dothan Trucking but those which were operated from Huntingburg, Indiana, were operated by Furniture Co. and those which were operated from Dothan, Alabama, were operated at first by Furniture Co. and later by Napier. The personnel which loaded and operated these trucks were employees of Furniture Co. or Napier. No Form 1065 partnership return was filed for Dothan Trucking or Huntingburg Trucking Company prior to returns which were filed for each of them for the year 1957. The minute book of Furniture Co. does not make any reference to a lease or rental agreement *238 between it and Huntingburg Trucking Company or Dothan Trucking. The trucking operations from both Dothan, Alabama, and Huntingburg, Indiana, made deliveries outside the States of Alabama and Indiana, respectively. During the years from 1949 through 1957, McMurtrie reported his income from Huntingburg Trucking Company and Dothan Trucking on his income tax returns as "Income From Trucking." During the year 1949, Stimson and Blemker reported their income from Huntingburg Trucking Company on their income tax returns as part of a single figure representing their total income from Furniture Co. Blemker reported his income from Huntingburg Trucking Company and Dothan Trucking in the same manner for the years 1950, 1951, 1952 and 1953. He reported his income from Huntingburg Trucking Company and Dothan Trucking in the years 1954 and 1955 as income from "Huntingburg Furniture Company, Trucking Account." In 1956, Blemker reported his income from Huntingburg Trucking Company as income from "Huntingburg Furniture Company, Trucking Account." He reported his income from Dothan Trucking as income from "Napier Furniture Co., Dothan, Alabama." In 1957, Blemker reported his income from Huntingburg *239 Trucking Company as income from "Huntingburg Lines, Huntingburg, Indiana." He reported his income from Dothan Trucking as income from "Napier Furniture Co., Dothan, Alabama." Stimson reported his income from Huntingburg Trucking Company and Dothan Trucking for the years 1950 through 1956 as "Supervisory Fees." In 1957, he reported his income from Huntingburg Trucking Company and Dothan Trucking as income from "Partnership." Facts Concerning Napier In the latter part of 1940 Furniture Co. purchased a plant at Dothan, Alabama. Montgomery Ward, a large customer of Furniture Co., had agreed to purchase $500,000 of merchandise annually for 10 years if Furniture Co. would inaugurate an operation in the South. The City of Dothan sold a tract of land and buildings to Furniture Co. for approximately $20,000. In addition, Furniture Co. spent approximately $110,000 for machinery and a sprinkler system. Napier Furniture Co., Inc., was started as a division of Furniture Co. in 1946. In 1953, separate books and records were set up for Napier, as well as the five other divisions of Furniture Co. The property at Dothan, Alabama, was operated as a division of Furniture Co. and the earnings *240 from 1947 through 1956 are set forth below: Earnings
Year
before Taxes
1947
($149,835.09)
1948
10,895.80
1949
4,843.55
1950
42,214.02
1951
12,631.25
1952
16,541.35
1953
31,589.49
1954
79,182.79
1955
179,328.52
1956
215,523.87
Napier was organized under the laws of the State of Alabama, as a wholly-owned subsidiary of Furniture Co. on March 13, 1956, retroactive to January 1, 1956. Total authorized capital stock was $100,000 made up of 10,000 shares with a par value of $10 each. The officers and the stockholdings, were as follows: Shares
R. H. McMurtrie - President
1
$ 10.00
John J. Stimson - Vice Presi-
dent
1
10.00
E. Lane Wells - Treasurer
1
10.00
C. E. Blemker - Secretary
1
10.00
B. G. Robertson
1
10.00
Ronald Egbert
1
10.00
Huntingburg Furniture Co.,
Inc.
2,494
24,940.00
2,500
$25,000.00
On the date of incorporation of Napier, there existed on the books of Furniture Co. two intracompany accounts, showing a net due from Napier, in the amount of $468,239. One of such accounts totaling $273,405.31 represented the original investment in the buildings and equipment plus cash advances from time *241 to time. The second account totaling $194,833.69 represented the actual earnings of the branch prior to its incorporation as follows: 1953 profits
$ 31,800.40
1954 profits
79,182.97
$110,983.37
Less prior payments
95,478.20
Balance
15,505.17
1955 profits
179,328.52
$194,833.69
On March 13, 1956, Furniture Co. transferred total assets of $543,213.56 less accounts payable due vendors by Napier and accrued expenses totaling $74,974.56 to Napier. In effect it transferred net assets in the amount of $468,239. An entry was made on Furniture Co.'s books showing a debit of $25,000 to capital stock (Napier) and a credit to the intracompany account. This reduced the open account from $273,405.31 to $248,405.31. Napier's opening entries were as follows: Debits: Net Assets
$543,213.56
Credits: Open account payable to Furni-
ture Co.
$443,239.00
Accounts payable vendors
67,258.57
Accrued expenses
7,715.99
Capital stock
25,000.00
$543,213.56
Beginning February 29, 1956, Napier started paying on the aforesaid open account payable. Payments throughout the year were made in a total amount of $142,072.66. In May 1957, $52,761.03 was *242 paid. This left a balance due Furniture Co. in the open account of $248,405.31, and such amount has remained static to date. The Napier letterheads, checks, invoices to customers, and issued W-2 forms contained the same heading before and after incorporation. Napier did not file its own social security and withholding tax returns, and did not file its own Federal tax returns for employers. Furniture Co. added the relevant Napier data to its own returns. Napier did file state unemployment tax returns in Alabama after its incorporation. Furniture Co. had done this prior to Napier's incorporation. There were differences in furniture design and prices between the products originating in Alabama and those produced in Indiana. Facts Concerning Consolidated Consolidated was formed to build a warehouse which would be utilized by Furniture Co. Stimson, Blemker, and McMurtrie each contributed $5,000 to Consolidated, and each owned 50 shares of its stock. Most of the original investment was used in acquiring land, and funds were borrowed to construct a concrete building 100 X 200 feet in dimensions. Various divisions of Furniture Co. rented space in Consolidated's warehouse in order *243 to send to the warehouse furniture manufactured at the various plant locations. This arrangement provided savings and convenience of assembly and shipment. The monthly rental paid by the various divisions was as follows: Timely Furniture Company
5,000 sq. ft. at 2-3/4"
$137.50
Furniture Co. - Pl. #1
5,000 sq. ft. at 2-3/4"
137.50
Stylemaker Furniture Company
6,987 sq. ft. at 2-3/4"
192.41
English Furniture Works
1,333 sq. ft. at 2-3/4"
36.36
Worth-mor Furniture Company
400 sq. ft. at 2-3/4"
11.00 Rent was also paid Consolidated by Furniture Co. for the lease of space for its trucking operations. This agreed rental was based upon a price of 10 cents per square foot per month for the paved area used and $10 per truck loaded. There was also a facilities charge for the storage and repair of trucks on Consolidated's premises. Facts Concerning Claimed Expenses of Blemker and Stimson During the years 1953, 1954, and 1957 Blemker was employed by Furniture Co. as manager of a division located in Huntingburg, Indiana. During the years 1956 and 1957 Stimson was employed by Furniture Co. as manager of a division in Ferdinand, Indiana. Among others, Blemker *244 claimed the following expenses: 1953
1954
1957
Auto depreciation and expenses incurred in line of business and not other-
wise compensated
$150.00
375.00
Expenses incurred in traveling for company not reimbursed - Auto depre-
ciation, gas, oil, repairs, tires, insurance
$431.71
Unreimbursed entertainment and sales promotion
302.40
Club and business association dues
60.00
$150.00
$375.00
$794.11
Among others, Stimson claimed the following expenses: 1953
1954
1957
Entertaining customers in home
$500.00
$500.00
$500.00
One-half home telephone
100.00
49.19
$500.00
$600.00
$549.19
It was Furniture Co.'s practice to reimburse for business expenses incurred while entertaining out of town. However, it was the company's policy, eventually embodied in a resolution, not to reimburse for entertainment expenses incurred in and around Huntingburg. Such entertainment was not required as a condition of employment of Blemker and Stimson, although it was within the scope of their positions. Customer entertainment could have affected the bonuses of Blemker and Stimson. Ultimate Facts The useful lives of the trucking equipment *245 were 6 years. The various rentals and fees paid to Consolidated by Furniture Co. for itself and on behalf of the Huntingburg Trucking Company were reasonable and were necessary for the continued use and occupancy of the premises. Blemker incurred ordinary and necessary business expenses during the years 1953, 1954 and 1957 in the amounts of $50, $125, and $402.40, respectively. Stimson incurred ordinary and necessary business expenses during the years 1953, 1956 and 1957 in the amounts of $150, $200 and $150, respectively. Opinion Issue 1 The first question presented is whether Furniture Co. or certain individuals operating as a partnership or joint venture actually earned the income from the trucking operation. Furniture Co. contends that these individuals provided certain trucking equipment to it, and that they were paid a reasonable amount for the use of such equipment. The income resulting from these payments would thus be that of the individuals. Respondent views the trucking operation solely as a device to siphon off Furniture Co's earnings. He argues that the purported partnerships or joint ventures served no useful business purpose and did nothing other than *246 to receive profits. Therefore, he urges that the income from the trucking operation was in reality earned by Furniture Co., and that no partnerships existed in reality or for tax purposes. In Grenada Industries, Inc., 17 T.C. 231 (1951), affirmed on other issues 202 F. 2d 873 (C.A. 5, 1953), two corporations manufactured hosiery. The controlling shareholders formed a partnership (Abar) to purchase waste and defective hosiery and to repair the hosiery or reclaim the yarn. All of the employees and officers of the partnership were also officers and employees of the corporations. We sustained the separate taxable status of Abar, saying: (pp. 255-256) The area in which Abar operated was a separate and distinct phase of the industry, and it was, moreover, a phase never before entered either by National or Industries. And despite all the intertwining relationships, the fact remains that Abar paid and received fair market prices, as though its transactions had been carried on with strangers. No more could be expected of it. While the interests controlling Industries and National could have set up salvage departments within those corporations, the uncontradicted *247 testimony was that a single mill usually did not have enough waste to justify such a step, and, in any case, there was no obligation to adopt the course which carried the greater tax burden. * * * We believe that the proper criteria in determining whether two partnerships such as the instant ones should be recognized for tax purposes were stated in Seminole Flavor Co., 4 T.C. 1215, 1235 (1945), thusly: Here the stockholders used their separate funds to organize a new business enterprise which entered into a contract with the corporation to perform certain services for a consideration that we consider fair in the light of the previous experience of the corporation. Since there was no obligation on the stockholders to arrange their own and the petitioner's affairs so as to result in a maximum tax burden, cf. Stanley D. Beard, 4 T.C. 756, we should give effect to the realities of the situation and recognize the existence of the partnership, and we so hold. * * * See Moke Epstein, Inc., 29 T.C. 1005 (1958), and cases cited therein. Viewing the record before us in its entirety, we conclude that petitioners have proven that partnerships *248 were formed to provide trucks for the use of Furniture Co. Trucking was a phase of the furniture business in which Furniture Co. had never entered, and which in fact McMurtrie and Leland, as partners, had conducted for several years prior to 1949. Grenada Industries, Inc., supra. The partners' interests were unrelated to their stock holdings of Furniture Co., and their charges never exceeded those of a common carrier. It was established that Furniture Co. did not feel it could have afforded to enter the trucking business in 1949. We therefore conclude that the partners contributed their personal funds in good faith and acted with a business purpose. See Commissioner v. Culbertson, 337 U.S. 733 (1949). Respondent relies on R.O.H. Hill, Inc., 9 T.C. 153 (1947), in which the alleged partnership had capital of only $150, performed no services, had no fair contract with the corporation, and received the greater part of the corporation's earnings. In sharp contrast, the partners in the cases at bar invested at least $3,600 each in the trucking ventures. The partnerships provided hauling for Furniture Co. at a favorable price, and served a valid *249 business purpose. Respondent stresses certain aspects of the partnerships which, he asserts, negate their very existence. No written partnership agreement existed, no partnership returns were filed prior to 1957; usually the partnerships had no separate bank account, the partners reported their income in varying fashions inconsistent with it being partnership income; the partnerships had no employees, no telephone, no offices, and did not hold legal title to the trucks used in the delivery operations. From these facts respondent asks us to ignore the partnerships for tax purposes. The record shows that each partner testified that he thought that he was putting up capital to purchase trucks which Furniture Co. would use in its business, and from which use partnership profits were expected. The money was put up, the trucks were purchased, and Furniture Co. used them and paid for the use thereof. The informality was due to the mutual trust of the partners in each other. The partnerships performed a valuable service - providing trucks for Furniture Co. - which Furniture Co. was unable or unwilling to do for itself. It charged fair prices. We therefore hold that the income from the *250 trucking operations is taxable to the partners therein. Respondent alleges that Furniture Co. did the actual hauling. We are unable to understand why that fact prevents another entity from deriving income from the supplying of such trucks. We conclude that the providing of trucks constituted a bona fide business activity, the income of which is taxable to the partners. Grenada Industries, Inc., supra; Seminole Flavor Co., supra.
Issue 2 No evidence was presented concerning the useful lives of the tractors and trailers. Petitioners contend that 3 of 41 pieces of equipment were sold after 3 years' use, and that 3 years is their useful life in petitioners' business. The record does not indicate such sales, except in the tax returns, but even if such sales did occur, they alone do not even approach proof of useful life. We sustain respondent on this issue. [7]
Issue 3 Respondent determined that a 1 percent per month return on Consolidated's actual cost constituted a fair rental, and disallowed all payments in excess thereof made by Furniture *251 Co. both for itself and for the trucking venture as nondeductible expenditures. He argues that the 1 percent monthly return was all that was necessary as a condition to the continued use of the property, concluding that only amounts totaling that return are proper rent deductions. [8]
Respondent has not determined what was required to procure loading, parking spaces, storage, or truck servicing and repair facilities. Instead, he based his disallowance of the payors' expenses solely upon the rate of return to the payee. It is this aggregate *252 determination which petitioner bears the burden of disproving. Petitioner introduced testimony tending to show (1) that the savings from having all of the furniture in one central location was in excess of $10 per truckload, (2) that $2 per day per unit (i.e., a tractor or a trailer) was a reasonable charge for parking adjacent to fuel facilities, and (3) that the per mile charges of the Huntingburg trucking operation, including the charges imposed by Consolidated to Furniture Co. were less than those which would have been charged to Furniture Co. had it leased trucks. In contrast to this credible testimony, respondent made no showing as to what reasonable and fair charges would be for the different facilities and services provided by Consolidated. He has made no determinations of these, other than that their aggregate does not exceed a 1 percent monthly return of Consolidated's actual cost of its terminal. Viewing the entire record we conclude that petitioners have proven that the payments to Consolidated were fair and reasonable rentals required to be made to insure the continued use of the premises. It necessarily follows that all of such payments constitute taxable income to *253 Consolidated. While the rate of return of Consolidated's investment is unusually high, we attribute this to factors other than unreasonable charges and rentals. Issue 4 In recomputing the net operating loss deduction of Furniture Co. for the taxable year 1953, respondent increased income for the years 1951 and 1952 by including income from the trucking operation, disallowing rent deductions, and allowing certain depreciation deductions. The latter two items relate to abandoned issues, and the trucking income has been treated in Issue 1, supra. The correct net operating loss deduction may now be computed under Rule 50. Issue 5 Respondent determined that the payments by Napier to Furniture Co. constituted dividends. The parties agree that upon the formation of Napier, Furniture Co. transferred net assets of $468,239 to Napier. This asset, an open account receivable, included Furniture Co.'s aggregate investment ($273,405.31) and earnings of the Napier division prior to its incorporation ($194,833.69). Capital stock of $25,000 was credited to this account. Within 15 months, Napier repaid $194,833.69, and the balance ($273,405.31 less $25,000, or $248,405.31) remains unpaid. *254 Respondent concluded that Napier was thinly incorporated, that the open account was not a bona fide indebtedness but represented equity investment, and that the payments by Napier to its sole shareholder were dividends. He notes that in effect Napier repaid Furniture Co. the exact amount of the earnings and profits of the Napier division prior to its incorporation. Furniture Co. admits that at Napier's inception its debt was $518,213 8a (of which $443,239 was owed to Furniture Co.) and its equity was $25,000. However, it argues that the book debt-equity ratio of 21:1 should be ignored. It emphasizes that Napier earned approximately $180,000 and $215,000 before taxes in 1955 and 1956, respectively. Furniture Co. then concludes that either (1) the book assets of Napier were undervalued, or (2) a corporation earning $200,000 annually can realistically have debt of $443,000. Furniture Co.'s first argument that Napier was not thinly capitalized and that the open account was a bona fide indebtedness is that Napier's assets were undervalued. It capitalized earnings after taxes at 10 percent, and *255 thereupon found assets to be $1,000,000. It has, by alternative methods of revaluations, suggested ratios of 1.3 to 1, 3.7 to 1, and 1 to 1. It has offered no authority for such revaluations. However, the debt-equity ratio is but one factor in determining whether advances by a sole shareholder are true debt or risk capital. John Kelley Co. v. Commissioner, 326 U.S. 521 (1946). No fixed date of maturity or fixed interest rate existed. Mullin Building Corporation, 9 T.C. 350 (1947), affd. per curiam, 167 F. 2d 1001 (C.A. 3, 1948). On the other hand, there was an expectation of repayment. Arlington Park Jockey Club v. Sauber, 262 F. 2d 902 (C.A. 7, 1959). We have not been shown any plan for repayment, or whether payment was to be made solely from earnings, or whether such a "loan" could have been obtained from outside sources. See O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, 125-126 (C.A. 9, 1960), affirming a Memorandum Opinion of this Court. We conclude that Furniture Co. has failed to prove that the open account was indebtedness, as opposed to risk capital as determined by respondent. Debt has *256 been well defined in Gilbert v. Commissioner, 248 F. 2d 399, 402-403 (C.A. 2, 1957), as: The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof. While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, Commissioner of Internal Revenue v. O.P.P. Holding Corp., 2 Cir., 76 F. 2d 11, too great a variation will of course preclude such treatment. Gregg Co. of Del. v. Commissioner, 3 Cir., 239 F. 2d 498; Jewel Tea Co. v. United States, 2 Cir., 90 F. 2d 451. Furniture Co. transferred assets to Napier. It retained $25,000 of equity and an open account of $443,239. Within 15 months Napier had repaid $194,833.69, and thereafter has repaid nothing. We are unable to categorize this open account as indebtedness, and hold that the repayments made during 1956 and 1957 were dividends to Furniture Co. [9]
*257 Issue 6 Respondent determined that a major purpose for Furniture Co.'s transfer of its Dothan division to Napier was to secure a surtax exemption, and therefore disallowed such exemption pursuant to section 1551 of the Internal Revenue Code of 1954. [10]Napier bears the burden of proving by a clear preponderance of the evidence that the securing of the exemption was not a major purpose of the transfer of assets to it. *258 Napier contends that it was incorporated because it was deemed advisable to be a "local" firm in Alabama, rather than a "Yankee" firm. The only evidence on this point is that Napier sold different types of furniture than those manufactured and sold in Indiana, and that Napier encountered resistance in Dothan as a "Yankee" firm. However, it appears that only the officials of the State of Alabama were aware of Napier's separate corporate status. Napier's letterheads indicated that it was still a division of Furniture Co. Its checks and invoices to its customers similarly so indicated, as did its W-2 forms for its employees. Furniture Co. filed Napier's Social Security and Withholding Tax returns and Federal Tax Returns for Employers. Napier filed its own Alabama Unemployment Tax returns. In addition, Napier argues that since Furniture Co. had several divisions, if it were seeking additional surtax exemptions it would have incorporated all of these divisions, not merely one. This argument is not persuasive, and does not attempt to explain why Napier was incorporated. In its petition, Napier listed certain State tax advantages from incorporation. No evidence was introduced to show *259 that these advantages existed, or, more significantly, that the procurement thereof was to any degree a reason for the actual incorporation of Napier. We cannot say that a desire to be known as a Southern firm motivated Napier's incorporation, as no prospective purchaser or customer could have discovered the fact of such incorporation without examining the records of the State of Alabama. Since the record fails to indicate the actual purposes for the incorporation, we conclude that Napier has not proven by the clear preponderance of the evidence that securing a surtax exemption was not a major purpose of the transfer of assets to it by Furniture Co. We therefore sustain respondent's disallowance of Napier's surtax exemption. Issue 7 Blemker and Stimson seek to join the long list of taxpayers who, having no substantiation for their alleged business expenses, seek refuge in the rule first stated in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930), that if we conclude that some deductible expenses were in fact incurred, we must approximate their amount, bearing heavily against the taxpayer because the inexactitude is of his making. Since Blemker and Stimson were *260 on bonus arrangements geared to profits, the entertainment and travel expenses were ordinary and necessary. With due allowance to Blemker's expense diary for 1957, we have made our ultimate findings on this issue. Decisions will be entered for the respondent in Docket Nos. 88904 and 88905. Decisions will be entered under Rule 50 in Docket Nos. 88906, 89414, and 89415. Footnotes
*. Proceedings of the following petitioners have been consolidated herewith: Huntingburg Consolidated Industries, Inc., Docket No. 88905; Huntingburg Furniture Company, Inc., Docket No. 88906; Charles W. Blemker and Mary Lee Blemker, Docket No. 89414; and John J. Stimson and Margaret E. Stimson, Docket No. 89415.↩
1. There is a claimed overpayment for this year of $3,466.92. ↩
2. There is a claimed overpayment for this year of $6,902.72. ↩
3. These deficiencies were first claimed in an amended answer.↩
4. The stipulation of facts of Furniture Co. erroneously stated this figure to be $100.00↩
5. Erroneously stipulated as "1959." ↩
6. Erroneously stipulated as "two new units."↩
*. This figure includes one tractor that was transferred from the Huntingburg trucking operation to a division of the Furniture Co. in 1957.↩
7. The depreciation will affect the distributive shares of Blemker and Stimson in the trucking operations.↩
8. Section 162(a)(3), I.R.C. of 1954, provides: SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - * * *
(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
8a. Because of a mistake in addition, Furniture Co. states this figure as $517,213.↩
9. No argument has been made that these repayments are anything other than the repayment of loans or indebtedness. We need not decide whether Napier could sustain debt of $443,000 with its earnings picture, as we view the open account as not being a bona fide indebtedness.↩
10. SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT. If any corporation transfers, on or after January 1, 1951, all or part of its property (other than money) to another corporation which was created for the purpose of acquiring such property or which was not actively engaged in business at the time of such acquistion, and if after such transfer the transferor corporation or its stockholders, or both, are in control of such transferee corporation during any part of the taxable year of such transferee corporation, then such transferee corporation shall not for such taxable year (except as may be otherwise determined under section 269(b)) be allowed either the $25,000 exemption from surtax provided in section 11(c) or the $60,000 accumulated earnings credit provided in paragraph (2) or (3) of section 535(c), unless such transferee corporation shall establish by the clear preponderance of the evidence that the securing of such exemption or credit was not a major purpose of such transfer. For purposes of this section, control means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of stock of the corporation. In determining the ownership of stock for the purpose of this section, the ownership of stock shall be determined in accordance with the provisions of section 544, except that constructive ownership under section 544(a)(2) shall be determined only with respect to the individual's spouse and minor children. The provisions of section 269(b)↩, and the authority of the Secretary under such section, shall, to the extent not inconsistent with the provisions of this section, be applicable to this section.