**COMMISSIONER OF INTERNAL REV-
ENUE v. CHELSEA PROD-
UCTS, Inc.**

Nos. 10652, 10653.

United States Court of Appeals,
Third Circuit.

Argued March 21, 1952.

Decided June 24, 1952.

Louise Foster, Washington, D. C. (Ellis N. Slack, Acting Asst. Atty. Gen., A. F. Prescott, Sp. Asst. to Atty. Gen., on the brief), for petitioner.

Ferdinand Tannenbaum, New York City (Olvany, Eisner & Donnelly, New York City, on the brief), for respondent.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

The Commissioner of Internal Revenue has petitioned for a review of two decisions of the Tax Court.[1] The principal issue presented is whether Section 45 of the Internal Revenue Code, 26 U.S.C.A. § 45, authorizes the Commissioner to combine the net income of three corporations with that of taxpayer where all are owned by the same interests. We are in accord with the Tax Court's conclusion that Section 45 was erroneously applied.

Between 1941 and 1944, taxpayer was engaged in the manufacture and sale of fans and blowers under the name of Chelsea Fan & Blower Co., Inc.[2] During this period the sole stockholders, officers, and directors of taxpayer were William J. Lohman, Sr., who held 50% of the common stock outstanding, and his two sons, Eugene W. and William J., Jr., each of whom held 25%.

In 1944 the three Lohmans, after consultations with their attorney, decided to separate taxpayer's manufacturing functions from its sale. The new plan was carried out by forming a sales corporation in each of three states: Missouri, Georgia, and New Jersey. These new corporations bore the respective names Chelsea Fan and Blower Company of Missouri, Chelsea Fan & Blower Company of Georgia, and Chelsea Fan and Blower Co., Inc. Each of the sales companies issued 1200 shares of stock at $1 a share, which was subscribed to in equal amounts by each of the three Lohmans. As in the case of taxpayer, the three Lohmans constituted the Board of Directors of each of the sales companies during the taxable years involved. At the same time, the taxpayer changed its name to Chelsea Products, Incorporated, and thereafter confined its activities principally to manufacturing.

Prior to the creation of the new corporate structure in 1944, taxpayer had sold its products through its officers and through "manufacturer's agents." Taxpayer had entered into contractual arrangements with these agents whereby they were paid commissions of about 10% on sales. After July 11, 1944, taxpayer no longer employed these manufacturer's agents. On that date the sales companies were designated exclusive agents, each company being assigned a different area of the country, and they in turn proceeded to employ sales agents. The arrangements between taxpayer and the sales companies were formalized by written agreements entered into between taxpayer and each sales company. These agreements, signed by William J. Lohman as president of taxpayer and Eugene W. Lohman as vice president of the sales companies, provide that each sales company is to "employ a sufficient number of salesmen to properly canvass its territory" and is to be charged the list price less 50% and 25%. The former discount was the standard one given by those in the industry to wholesale jobbers and was passed on to the wholesale jobbers who bought the products. The 25% discount, the Tax Court found, includes the 10% commission normally paid to the agent, thus leaving 15% for the operation of the business of the sales companies.

Although the Missouri and Georgia companies had mailing addresses in their respective states of incorporation, neither had an office there. Each of the sales companies maintained its office in New Jersey at 1206 South Grove Street, Irvington—the same address which had been occupied by taxpayer. Each of the companies had separate books and records and separate bank accounts. The records of the sales companies were kept by the same bookkeeper who kept taxpayer's books and were audited by an outside accounting firm.

---

1. Detailed findings of fact are set forth in the opinion of the Tax Court, 16 T.C. 840.

2. Taxpayer was organized in 1941 to succeed a New York corporation of the same name.

During the taxable years involved, all the fans and blowers sold by the sales companies were manufactured by taxpayer. A sales agent, upon receiving an order, would send it to Irvington, N.J., to the sales company which employed him. The order was then turned over to taxpayer which shipped the merchandise directly to the customer and invoiced the sales company. The latter, in turn, submitted an invoice to the customer and received payment from him.

The business reasons which prompted the organization of the sales companies are set forth in the record. The attorney whom the Lohmans consulted in 1944 testified that he had advised them that taxpayer's tort liability arising from accidents in the use of the fans could thereby be "minimized." The record also reveals that the Lohmans had intended that the sales companies establish assembly plants in several states in order to reduce freight costs. Further, the Lohmans believed that sales, especially in the South, would be increased if promoted by a local firm.

The Commissioner determined that there was a deficiency of $110.58 in taxpayer's income tax liability and $37,091.85 in its excess profits tax liability for the year 1944. He also determined that there was a deficiency of $165.62 in its income tax liability and $25,519.13 in its excess profits tax liability for the year 1945. In arriving at these deficiencies, the Commissioner allocated the net income of the three sales companies to that of taxpayer. The latter then sought a redetermination before the Tax Court. The Tax Court found that each sales company was a business enterprise separate and distinct from taxpayer and that no part of the income of the sales companies constituted income to it. Moreover, that Court deter-

mined that the principal purpose for the organization of the sales companies was to carry on business and not to aid taxpayer in evading or avoiding Federal income or excess profits taxes. The Tax Court, five judges dissenting, held that the Commissioner's action was not authorized.

The Commissioner asserts that he acted within the broad discretionary power conferred upon him by Section 45, which section reads: "Allocation of income and deductions. In any case of two or more organizations, trades, or businesses * * * owned or controlled directly or indirectly by the same interests, the Commissioner is authorized to distribute, apportion, or allocate *gross income,* deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." (Italics supplied.)

Section 45 has been a part of our Revenue Laws since 1928.[3] It is in some sense an offspring of Section 240(f)[4] of the Revenue Act of 1926, which gave the Commissioner the right to consolidate the accounts of businesses controlled by the same interests where he finds it necessary to make an accurate distribution of profits and deductions.[5] Section 240(f) was a part of the Consolidated Returns section of the 1926 Act. In drafting the new Section 45, important changes were made and, significantly enough, the offspring became a new section, separate and apart from the Consolidated Returns section.

Section 45 grants to the Commissioner power to allocate "gross income, deductions, credits, or allowances". There is no men-

3. The section has remained unchanged since 1928 except for a minor amendment in 1944. Act of February 25, 1944, c. 63, Title I, § 128(b), 58 Stat. 48.

4. "In any case of two or more related trades or businesses (whether unincorporated or incorporated and whether organized in the United States or not) owned or controlled directly or indirectly by the same interests, the Commissioner may and at the request of the taxpayer shall, if necessary in order to

make an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or businesses, consolidate the accounts of such related trades or businesses." Revenue Act of 1926, § 240(f), 26 U.S.C.A.Int.Rev.Acts, page 191.

5. See Asiatic Petroleum Co. v. Commissioner, 2 Cir., 1935, 79 F.2d 234, 236, certiorari denied, 1935, 296 U.S. 645, 56 S.Ct. 248, 80 L.Ed. 459.

tion of authority to disregard completely the corporate entity by combining the net income of controlled corporations. The plain language of Section 45 must prevail.

The scope and purpose of Section 45 is clearly set forth in the Treasury Regulations. Treasury Regulation 111, § 29.45-1 (b) states: "The purpose of section 45 is to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled taxpayer, the true net income from the property and business of a controlled taxpayer. * * * The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. * * It is not intended (except in the case of the computation of consolidated net income under a consolidated return) to effect in any case such a distribution, apportionment, or allocation of gross income, deductions, credits, or allowances, or any item of gross income deductions, credits, or allowances, as would produce a result equivalent to a computation of consolidated net income under section 141." The Report of the House Ways and Means Committee states that the evil for which Section 45 was designed was the arbitrary shifting of profits from one corporation to another by such devices as fictitious sales. House Rep. No. 2, 70th Cong., 1st Sess., p. 16.

Both the Treasury Regulation and the Committee Report clearly delineate the scope of Section 45. This section authorizes the Commissioner to scrutinize all transactions between controlled corporations. His object is to arrive at the true net income of each controlled taxpayer and the technique used is the application of the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Whenever the lack of an arm's length relationship produces a different economic result from that which would ensue in the case of two uncontrolled taxpayers dealing at arm's length, the Commissioner is authorized to allocate gross income and deductions.

Section 45, based upon a recognition of the various corporate entities, merely allows the Commissioner to prevent distortions in income between controlled corporations. In fact, the Treasury Regulation itself states that Section 45 is "not intended (except in the case of the computation of consolidated net income under a consolidated return) to effect in any case such a distribution, apportionment, or allocation of gross income, deductions * * * as would produce a result equivalent to a computation of consolidated net income under § 141." The Commissioner, in disregarding the corporate entities of the sales companies and lumping together all net incomes, has proceeded beyond his statutory bounds.[6]

6. The Court of Appeals for the Second Circuit has recently handed down its decision in Advance Machinery Exchange, Inc. v. Commissioner of Internal Revenue, 2 Cir., 196 F.2d 1006. The taxpayer there was organized by one Blachman to deal in used machinery. Subsequently, two corporations (which we denominate A and B) were formed to engage in the same business and Blachman proceeded to engage in the same business individually. All four businesses were controlled by Blachman and his son. All the entities conducted their businesses at the same office and all used the identical employees and equipment. Each enterprise had many customers in common. In contrast to the instant case, *there was no separation of business functions* as among the four enterprises. The Tax Court's conclusion is well expressed in the following statement in its opinion: "All four businesses were controlled by J. Blachman and Seymour Blachman, father and son. The two operated the business and kept the books and records of all four businesses in such a way that the net profit of each could be manipulated as they saw fit, and, in general, so conducted the business that *it is impossible to determine where the activities of one or the other begin and end*." (Italics supplied.)

The Commissioner allocated the net income of Corporation A, Corporation B, and Blachman individually to the taxpayer, relying on both § 22(a) and § 45 of the Internal Revenue Code, 26 U.S. C.A. §§ 22(a), 45. The Tax Court, 8 T.C.M. 84 (1949), held that the Commissioner's determination was proper under the broad scope of § 22(a) but was silent on the applicability of § 45. The Tax Court was clearly of the opinion that the

624

The dissenting judges in the Tax Court were of the opinion that the allocation of net income was a shorthand way of allocating that portion of the gross income of the sales companies which exceeded their deductions. We cannot accept this approach. In fact, this argument points up a second error underlying the manner in which the Commissioner proceeded. The notices of deficiency in the instant cases merely state that given amounts alleged to represent the net income of the sales companies represent net income taxable to taxpayer. The notices contain no indication whatsoever that the Commissioner made his determination under Section 45. Moreover, the petitions and answers in these cases raise no issue with respect to the application of this section. See Burrell Groves, Inc., 16 T.C. 1163 (1951), acq. I.R.B. 1951–19–13660; Palm Beach Aero Corp., 17 T.C. 1169, No. 140, 525 C.C.H Standard Fed.Tax Rep. § 7237.

■ The deficiency notices were thus deceptive and gave taxpayer no notice that the Commissioner was proceeding under Section 45. Since Section 45 grants the Commissioner discretionary powers the burden falls upon the taxpayer to prove that the Commissioner's determination is arbitrary. G.U.R. Co. v. Commissioner, 7 Cir., 1941, 117 F.2d 187, 189; National Securities Corp. v. Commissioner, 3 Cir., 1943, 137 F.2d 600, 602, certiorari denied 1943, 320 U.S. 794, 64 S.Ct. 262, 88 L.Ed. 479. This considerable power given the Commissioner certainly carries with it a correlative duty to give the taxpayer fair notice in advance of hearing that the Commissioner has proceeded under Section 45. The taxpayer can hardly shoulder its burden if it does not know the Commissioner has proceeded under Section 45 or if it does not know which transactions or group of transactions the Commissioner has determined to have resulted in distortions of true net income.

■ The Commissioner asserts that his determination is also warranted by Section 129 of the Internal Revenue Code, 26 U.S. C.A. § 129, the pertinent portion of which is as follows: "Acquisitions made to evade or avoid income or excess profits tax. (a) Disallowance of deduction, credit, or allowance. If (1) any person or persons acquire, on or after October 8, 1940, directly or indirectly, control of a corporation, * * and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income or excess profits tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then such deduction, credit, or other allowance shall not be allowed. * * * (b) Power of Commissioner to allow deduction, etc., in part. In any case to which subsection (a) is applicable the Commissioner is authorized— * * * (2) to distribute, apportion, or allocate gross income, and distribute, apportion, or allocate the deductions, credits, or allowances the benefit of which was sought to be secured, between or among the corporations, or properties, or parts thereof, involved, * * *."

The Commissioner relies specifically on Subsection (b) (2) of the Section. Like Section 45, it speaks in terms of allocating "gross income, deductions, credits, or allowances". Hence there is certainly a real doubt as to whether the Commissioner has properly proceeded under this section. We need not decide this point, however, for the Tax Court has found as a fact that the principal purpose of the organization of the sales companies was to carry on business and not to aid in the evasion or avoidance of Federal income or excess profits taxes.

three enterprises other than taxpayer were mere shams. The Tax Court concluded with the following words: "*In reality, therefore, there is but one taxable entity, the petitioner, and all of the income of the business is attributable to it.*" (Italics supplied.) This finding is thus in marked contrast with the Tax Court's finding in the case at bar that each of the sales companies was a business enterprise separate from the taxpayer and

that the principal purpose for their organization was to carry on business.

In affirming the decision of the Tax Court, the Court of Appeals for the Second Circuit relied on § 45 rather than § 22(a). We consider the Court's observation with respect to § 45 to be essentially dicta, for, since the Tax Court had determined that there was but one taxable entity, all the net income was necessarily taxable to taxpayer under § 22(a).

We cannot say that this finding of fact is clearly erroneous. See Chester Distributing Co. v. Commissioner, 3 Cir., 1950, 184 F.2d 514. On the contrary, we think it is supported by substantial evidence.

For the above reasons, the decisions of the Tax Court will be affirmed.