MOKE EPSTEIN, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59279. Filed February 28, 1958.

*Murray Steinberg, Esq.*, and *Richard Marx, Esq.*, for the petitioner. *Sylvan Siegler, Esq.*, for the respondent.

PIERCE, *Judge:* The Commissioner determined deficiencies in petitioner's income tax, in the amounts of $2,861.34 for the year 1951, and $4,465 for the year 1952. Several of the adjustments set forth in the notice of deficiency were not contested.

The sole issue for decision is: Where the president of the petitioner corporation, which was a dealer in automobiles, was individually an authorized agent for an automobile insurance company, should the insurance commissions which the insurance company paid to him in respect of policies sold to petitioner's customers be included in the income of petitioner?

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, is incorporated herein by reference.

Petitioner, Moke Epstein, Inc., is a Missouri corporation which was organized in 1922. Prior to change of name in 1956, it was known as Epstein Chevrolet Company. Its income tax returns for the years involved were filed with the district director of internal revenue at St. Louis, Missouri.

At all times material, petitioner was an authorized dealer in Chevrolet automobiles in Wellston, Missouri. It operated under a franchise from the Chevrolet Motor Division of General Motors Corporation. Its president was Morris Epstein. Its authorized and issued capital stock, which was represented by 400 shares of common stock of no par value, was held as follows: Morris Epstein, 290 shares; Sylvia Epstein, his wife, 105 shares; and Phyllis Draffen, petitioner's secretary-treasurer and office manager, 5 shares.

The purposes of the corporation were defined in its certificate of incorporation, as follows:

SEVENTH: That the corporation is formed for the following purposes, to sell and distribute automobiles and parts, and for maintaining a service and repair department for automobiles and to do a general automobile sales business, and to do whatever may be necessary and convenient to carry on its said business, and such other business enterprises under the laws of Missouri, governing Manufacturing and Business Corporations, as the Board of Directors may from

time to time determine and to do and accomplish such objects as may be incident thereto.

There had been no change in these corporate purposes since the time of incorporation.

Petitioner employed from 7 to 10 salesmen. Its volume of sales was about 75 automobiles and trucks per month. Some of the vehicles were sold for cash, and others were sold on deferred payments. The latter were, in most cases, financed through arrangements made on behalf of the customers with General Motors Acceptance Corporation (hereinafter called G. M. A. C.) which is a subsidiary of General Motors Corporation; but in other cases, cars were financed through an incorporated subsidiary of the petitioner, known as Epstein Finance Company. Both G. M. A. C. and Epstein Finance Company required that cars financed by them be insured; but, in each case, the customer was free to select whatever insurance agent and insurance company he desired.

Morris Epstein, in his individual capacity, had in 1941 entered into an insurance agency agreement with Motors Insurance Corporation (hereinafter called M. I. C.) which was another subsidiary of General Motors Corporation. This agreement designated Morris Epstein as agent for said insurer; granted him authority to receive and forward to said insurer, applications for various types of automobile insurance; gave him full power and authority to collect, receive, and receipt for premiums on insurance policies written on such applications; provided that he should keep records of all the applications; and further provided that the insurer would render monthly accountings to him as agent, and also would pay him as full compensation, a commission equal to 25 per cent of the total premiums received on all insurance business accepted from him. The agreement was executed on February 17, 1941, by M. I. C. as the insurer, and by Morris Epstein individually as the agent. The petitioner corporation was not a party to said agency agreement, and it was in no way mentioned therein. The agreement continued to be in full force and effect throughout the taxable years here involved.

M. I. C. engaged primarily in writing insurance on automobiles that were financed by G. M. A. C.; but it also wrote insurance on automobiles that were not so financed. Morris Epstein, in years prior to those here involved, had written policies as agent for said insurer, not only on cars which the petitioner corporation had sold and financed through G. M. A. C., but also on cars which petitioner had either sold for cash, or had financed through its own subsidiary, Epstein Finance Company. Also in these prior years, Epstein had written insurance on cars sold by other dealers; and, in addition, he had written policies not connected with automobiles, such as policies covering property damage and public liability. However, during

the particular years here involved, all the insurance written by Epstein represented either renewals of policies that he had previously written, or new policies on cars sold by the petitioner corporation.

The manner in which Epstein sold insurance to petitioner's customers during the years involved was as follows. In his capacity as president of petitioner, he took an active part in either personally handling or supervising petitioner's sales, and he also attended to making financing arrangements with G. M. A. C. or Epstein Finance Company for cars sold on deferred payments. In cases where he personally handled the sale of a car, he would, during the course of the transaction, solicit the customer for insurance thereon. And in cases where the sale of the car was handled by one of petitioner's salesmen, the latter would introduce him to the customer, and he would then solicit the insurance. Some of the customers already had insurance or would prefer to buy it elsewhere; but in many cases, Epstein personally obtained an application for a policy. In any case, the commission received by a salesman for his sale of a car was neither increased nor reduced by the fact that Epstein may, or may not, have obtained an application for insurance thereon.

The petitioner corporation, in connection with its sales of cars, used various printed forms which were designed and distributed by the Chevrolet Motors Division of General Motors Corporation, for use of its dealers generally. One of these forms was designated "Car Invoice"; it contained spaces for a description of the car sold, a description of any additional equipment or accessories, and a description of any insurance which the customer might obtain in connection with the same. Another printed form which was used for cars that were to be financed by G. M. A. C. was entitled "Customer's Statement"; this contained spaces for various information regarding the customer's credit, and also regarding the insurance which, as stated therein, the customer could obtain from whatever source he might choose. These forms were filled out by members of petitioner's staff; and copies were retained for petitioner's records. Petitioner, however, did not make any entry in its records regarding insurance sales; nor did it ever receive or record any commission from the sale of insurance. Petitioner was not a party to any insurance agency agreement, either with M. I. C. or with any other insurance company.

Whenever Morris Epstein obtained an application for automobile insurance from a customer of the petitioner, he would fill out in triplicate a printed form designated "Motors Insurance Corporation—Application for Insurance," which M. I. C. prepared and distributed for use of its agents. The preparation of such applications was in most cases handled by Epstein personally; but under arrangements made with M. I. C., two of petitioner's salesmen were authorized to

act for him, as "solicitor agents" under his agency agreement. After the customer had signed the application, the original thereof was forwarded by Epstein to M. I. C.; and, if the same was approved by said insurer, the policy would be prepared by M. I. C. and mailed to Epstein at petitioner's place of business. Epstein would thereupon countersign the policy as agent, and send it to the applicant, using his own personal envelope and stamps. Subsequently, upon expiration of the term of the policy, he would solicit a renewal of the insurance. Most of Epstein's solicitations, both of renewals and of new policies, were made either in petitioner's principal place of business, or in another small nearby office of petitioner which was used principally by Epstein.

M. I. C., acting in accordance with the terms of the agency agreement, accounted to Epstein every 30 days for all insurance obtained through him; and in these accountings it would make adjustments for any policy cancellations. Also, at the time of each such accounting, M. I. C. would send Epstein a check for the amount of all commissions due him, which check designated Epstein individually as the payee. No insurance commissions were ever sent to, or received by, the petitioner.

Epstein deposited all of the checks issued to him by M. I. C. for agent's insurance commissions, in his personal bank account. And he included the amounts thereof in his individual gross income which he reported on income tax returns filed jointly by him and his wife. The amounts of such insurance commissions so reported on his returns for the years here involved were: $4,321.55 for the year 1951; and $7,155.97 for the year 1952.

M. I. C. reported the amounts of all insurance commissions which it paid to Epstein during the years involved, on information returns (Form 1099) that it filed with the Internal Revenue Service. These information returns stated that the commissions were paid to Morris Epstein individually. It did not report any insurance commissions as having been paid to the petitioner corporation.

Petitioner, on its income tax returns for the years involved, reported the following:

|  | 1951 | 1952 |
|---|---|---|
| Gross sales | $2,398,697.46 | $2,245,028.64 |
| Total income | 507,279.04 | 402,010.82 |
| Total deductions | 381,279.58 | 343,262.34 |
| Net income | 125,999.46 | 58,748.48 |

No income from the sale of insurance was included either in the above-mentioned gross sales or total income; and no expenses relative to the sale of insurance were included in the above-mentioned deductions.

Morris Epstein did not reimburse petitioner for any portion of its rent or other operating expenses. The use of capital was not a material factor in the operation of his insurance agency business.

Respondent, in his deficiency notice, included in petitioner's income all of the insurance commissions which Epstein received and reported on his income tax returns for the years involved.

The insurance commissions received by Morris Epstein during the years involved were not earned by petitioner; were not received, accrued, or accruable by petitioner; and did not constitute income to the petitioner.

OPINION.

The sole issue here presented is, as above suggested, whether the insurance commissions which Morris Epstein received under his agency agreement with M. I. C., and which he included in his personal income reported on his income tax returns, constituted income to the petitioner corporation. Respondent contends that the writing of automobile insurance was an integral part of petitioner's business; and that, since Epstein was the president of petitioner and the policies, except in the case of renewals, were written on cars sold by petitioner, the agency commissions which were paid to Epstein by the insurance company should be charged to the petitioner. We do not agree.

The sale of automobile insurance is not necessarily an integral part of the business of selling cars and trucks. Indeed, the printed forms which were prepared and distributed by the car manufacturer and by G. M. A. C. indicated on their face that, while financed cars must be insured, the customer was free to place his insurance with whatever agent or insurer he might choose.

An automobile purchaser, in acquiring a car from any dealer, may enter into any one or more of three separate arrangements: (1) An arrangement with the dealer for purchase of the vehicle, together with equipment and accessories; (2) an arrangement with some financing company for handling any deferred payments; and (3) an arrangement with some insurance agent for a policy covering the vehicle, if he does not already have a policy which can be used. It would have been possible, of course, for the stockholders of petitioner to have made provision for the inclusion of all such business segments within the scope of the corporation's operations; but, instead, they elected to have them handled separately—the automobile sales to be handled by the petitioner corporation, the financing to be handled either by the separately incorporated subsidiary known as Epstein Finance Company or by G. M. A. C. which was an entirely separate corporation, and the insurance agency business to be handled by Morris Epstein individually. This was a natural and proper division of such functions.

This Court and others have recognized in numerous cases, that segments of what might have been an integrated business may be handled by separate taxpayers; and that the income of such separate taxpayers should not be combined for income tax purposes. See *Buffalo Meter Co.*, 10 T. C. 83 (involving separation of a corporate business, so that the foundry was retained by the corporation, but the manufacturing and sales were handled by a partnership composed of the stockholders); *Miles-Conley Co.*, 10 T. C. 754, affd. (C. A. 4) 173 F. 2d 958 (involving separation of a corporate fruit and produce business, so that the corporation retained the sale of fruits, and the president of the corporation handled the sale of vegetables as a sole proprietor); *Chelsea Products, Inc.*, 16 T. C. 840, affd. (C. A. 3) 197 F. 2d 620 (involving separation of a corporate business, so that the original corporation retained the manufacturing functions and newly organized corporations took over the handling of sales); *Seminole Flavor Co.*, 4 T. C. 1215 (involving separation of the business of a corporation, so that the original company handled the manufacturing, and a partnership of the stockholders handled the sales and servicing of customers); and *Ray Waits Motors* v. *United States*, (E. D. S. C.) 145 F. Supp. 269. This latter case involved facts almost identical with those in the instant case; for there, as here, an automobile dealership was operated by a corporation, and the corporation's president individually acted as an insurance agent for M. I. C. and sold policies to the corporation's customers. The court there held that the insurance commissions received by such agent were not includible in the income of the corporation.

In the *Buffalo Meter Co.* case, *supra* at 89, the Court stated:

As has been said repeatedly, the tax laws do not undertake to deny taxpayers the right of free choice in the selection of the form in which they carry on business. The petitioner's stockholders chose here to retain, in corporate form, one of the major functions of petitioner's business, the foundry, and to transfer to the partnership the manufacturing and selling division. This was in no sense an unnatural division. The foundry and manufacturing operations were not interdependent. Either might have existed independently of the other. * * *

In the instant case, Morris Epstein had for a period of 10 years prior to and including the years here involved, operated individually as an authorized insurance agent for M. I. C., under an insurance agency agreement which he had executed with that company. Prior to the present years, he had written insurance applications for said insurer, not only on cars sold by petitioner but also on cars sold by other dealers; and, in addition, he had sold certain nonautomobile policies, and had obtained renewals of policies which were about to expire. In the present years, however, all of his applications represented either renewals, or new policies sold to purchasers of petitioner's cars. All policies issued by the insurer on applications obtained

through Epstein were sent to him, for countersigning by him as agent, and for delivery by him to the applicant. All accountings of the insurer with respect to premiums received on such policies, and with respect to adjustments for canceled policies, were made with him monthly. The checks of the insurer for insurance commissions due Epstein were sent to him individually, as the insurer's agent; were reported by the insurer on its income tax information returns, as having been paid to him individually; and were not only deposited by Epstein in his personal bank account, but also were included by him in his personal income on his income tax returns. The petitioner corporation was not authorized to act as an insurance agent, either for M. I. C. or for any other insurance company; and it did not make any entry for insurance sales or insurance income, either in its corporate accounts or on its corporate income tax returns. The fact that petitioner did not charge Epstein with any portion of its overhead expenses, as being applicable to his solicitation of policies—amounts which in any event would have been more or less insignificant—does not, in our opinion, warrant a complete disregard of Epstein's agency, or the inclusion of all his insurance commissions in the petitioner corporation's income. The use of capital by Epstein was not essential to the operation of his insurance agency activities.

We here hold, in accordance with our findings of fact, that the insurance commissions paid to Morris Epstein by M. I. C. were not earned by petitioner; were not received, accrued, or accruable by petitioner; did not constitute income to petitioner; and should not be included in the taxable income of the petitioner for either of the years here involved.

*Decision will be entered under Rule 50.*