Claude L. Crepeau v. Commissioner.
Crepeau v. Commissioner
Docket No. 1810-67.
United States Tax Court
T.C. Memo 1969-236; 1969 Tax Ct. Memo LEXIS 59; 28 T.C.M. (CCH) 1232; T.C.M. (RIA) 69236; November 5, 1969. Filed Melvin G. Barclay, for the petitioner. Joel Gerber, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: The Commissioner determined a deficiency of $1,010.77 in petitioner's income tax for the year 1963. The issue presented is whether respondent erred in disallowing various expenses claimed as deductions on Schedule C of petitioner's income tax return. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioner, Claude L. Crepeau, is an unmarried resident of Greenfield, Mass., and filed his income tax return for the taxable year 1963 with the district director of internal revenue in Boston, Mass.
Petitioner, a graduate civil engineer, has been employed by the Department of Public Works of the State of Massachusetts from 1950 to the present time. As a civil engineer his duties have included work in the areas of land acquisition, *62 public works construction and rights of way designation. Additionally, he has worked in the Survey Division and the Materials Division of the Department of Public Works. In 1955, petitioner and a business associate formed the West River Granite Company, Inc. (hereinafter "West River"), each paying $3,000 and each receiving 50 percent of the outstanding stock of the corporation. The articles of association of West River, dated March 12, 1955, state that the corporation was formed: for the purpose of mining, quarrying and preparing for market, granite and other stones and minerals, and manufacturing the same into various products thereof, and transporting and selling the same in crude or manufactured form, and, as incident to such business or other legal activities of the Corporation, acquiring, holding, mortgaging and selling real and personal property, and possessing, maintaining and operating all necessary tools, appliances and plants; and also constructing and maintaining roads, buildings, dams, bridges and other works and manufacturing, purchasing, distributing and selling, construction and building materials and equipment and supplies of all types. West River is a duly authorized *63 corporation, having existed under the laws of Vermont from 1956 to the present. Petitioner and his associate were not in agreement as to the manner in which the business was to be run. They were unable to reconcile the difference of opinion which existed and in 1956 petitioner, in order to preserve the business, purchased all of his associate's stock. Since that time, petitioner has been the sole shareholder of West River's outstanding stock. In 1955 West River acquired a granite quarry for the sum of $6,000. Located in the town of Dummerston, Vt. (about 25 miles north of petitioner's home in Greenfield, Mass.), the quarry is on a wooded tract of approximately 300 acres and is bordered on one side by a river. Abutting the river on the opposite shore, about 800 feet from the quarry, there exists a strip of land which petitioner had purchased prior to 1963 and which he conveyed to West River in 1966. Route 30, a major highway, is located a short distance from this strip of land. To connect Route 30 with this riparian strip, petitioner had procured a right of way which, it appears, he also conveyed to West River in 1966. Some years prior to the acquisition of the quarry by West *64 River, a railroad had connected the quarry site with a nearby community to which the quarried rock had been shipped. However, the then owners of the quarry ran into financial difficulty and sometime around 1941 the tracks were 1233 removed and sold for scrap. Also scrapped was a railroad tressel which spanned the river referred to above. The net effect of this was to leave the quarry without any direct access to the far shore of the river and, hence, to Route 30. When West River purchased the quarry there were, however, three other means of access to it. Two were over public bridges which were posted for maximum loads of 16,000 pounds. The other was by way of a stretch of unpaved mountain road about five miles long and posted for 24,000 pounds. This road was steep and could not be used economically by heavy trucks hauling stone or rock. Without a railroad, the only practical means of hauling materials from the quarry would have to have been by 10-wheel dump trucks or trailer vehicles with a load capacity of about 72,000 pounds. This, of course, meant that the three existing means of access were not adequate for hauling materials from the quarry. Petitioner, now sole shareholder *65 of the corporation, was well aware of this problem. However, from the inception, it was his belief that the access problem could be surmounted by the construction of a paved ford across the river which, during times of low water level, would provide a direct truck route to Route 30. A bridge would have been too expensive. Buttressed by the knowledge that the Franklin County Trust Company would loan West River enough money to hire him to construct the ford, if a bona fide contract for the sale of rock were to materialize, petitioner began to accumulate machinery necessary to such construction. Hence, at various times between 1955 and 1963 petitioner purchased in his name a 1946 FWD dump truck, a 1948 GMC flatbed truck, a 1946 Chevrolet truck with an air compressor 1946 Chevrolet truck with an air compressor mounted thereon, a 1948 FWD telephone pole truck, a 1948 automobile and a small tractor. Except for the tractor, these vehicles were operable when purchased. All were operable during 1963, the tractor having been repaired after purchase. In 1957 or 1958 petitioner purchased a sand and gravel bank in Deerfield, Mass., which was about four miles south of Greenfield. At that time *66 petitioner had intended to start a sand and gravel business because he felt such business offered opportunities for profit which would be more immediate than the quarry. Petitioner envisioned that the automotive equipment described above would also be of service in working the sand and gravel business which had been incorporated under the name "Deerfield Sand and Gravel Company" (hereinafter "Deerfield"). Unfortunately, petitioner was successful only in selling small quantities of sand and gravel. [1]
To transport the automotive equipment from the various places of purchase to the location where *67 they were to be kept, petitioner was required by state law to obtain owner repair plates which permit the transportation of construction vehicles. The procurement of these plates was predicated on the filing of a business certificate with the State. Petitioner filed in the name of Deerfield. Deerfield's business activities were in no way connected to those of West River. However, it appears that petitioner's activities and those of Deerfield were closely connected as evidenced by petitioner's only personal checking account which was used to pay expenses associated with Deerfield as well as those expenses which were strictly personal. All of the automotive equipment has at all times been owned by petitioner in his private capacity. The vehicles were, for the most part, stored in a garage owned by one of petitioner's friends. The facilities were available without payment of rent; however, petitioner compensated his friend in other ways. In 1963, however, petitioner rented a heated facility for the vehicles at a cost of $99.50. Petitioner maintained contractor's liability insurance on the facilities which housed his automotive equipment. Most of the maintenance and repair work performed *68 on the vehicles was accomplished by petitioner. In addition to the expenditures incurred in maintaining and repairing the vehicles, petitioner incurred other expenses attributable to the maintenance of these vehicles such as the cost of telephone calls which were made to locate needed parts. He also incurred travel expenses stemming from trips which he made to 1234 procure needed parts once they were located. Over an eight-year period these expenses amounted to about $33,000. [2]
Because of the access problem, West River has perenially been stymied in its efforts to procure a construction contract. Although piles of rock were available for immediate delivery, West River *69 was caught in an economic vise: Without a contract for rock, it could not borrow funds from the bank to pay petitioner for the construction of a paved ford; and, without a paved ford, it was unable to attract a contract for the shipment of rock even though highway construction was underway in close proximity to the quarry. In 1966, West River failed to obtain a possible contract for rock when the Rogers Construction Company, the contractor with whom petitioner and West River were negotiating, was allowed to use rock smaller than that which had originally been required in its contract specifications. Petitioner filed an objection with the State of Vermont, but Rogers was, nevertheless, allowed to deviate from the contract specifications. Aside from this episode West River did not, until the time of this trial, come close to procuring a contract for the sale of rock. At the time of trial, negotiations were underway with a contractor who had been engaged to work on a section of Route 30. Notwithstanding this dismal business history, [3] petitioner believed that he would eventually realize substantial business profits from his investments in West River and the vehicles which he had *70 purchased. Of particular importance to petitioner was the fact that West River had at all times pertinent piles of stone ready for sale. At a dollar a yard petitioner felt that a single contract calling for this readily available stone might yield gross sales of as much as $90,000 or $100,000. In 1957 an individual wanted to use four or five acres of West River's land for a junk yard. Dummerston town officials would not issue a license to the individual, but were willing to issue one to petitioner. To make the land available for the individual, petitioner first entered into a lease agreement with West River under which he leased the entire quarry from West River for an annual rent of $700. Petitioner *71 then subleased the four or five acres to the individual for an annual rental of $100. Petitioner's lease with West River made no mention of royalty payments or the removal moval of rock from the quarry. The sublessee proved to be a poor tenant and soon went out of business. In 1959, petitioner's rent payments to West River were reduced from $700 to $10 per annum and remained at $10 through the taxable year 1963. In 1962, petitioner took a casualty loss deduction on his personal income tax return for property which had been damaged by vandals. Some of the damaged property was owned by West River. The entire casualty loss deduction was, nevertheless, taken on petitioner's personal income tax return. A similar episode occurred in 1964, petitioner treating the deduction which arose therefrom in a manner similar to his treatment of the 1962 casualty loss. The heading of Schedule C of petitioner's 1963 income tax return contains the following appellation: "Claude L. Crepeau d/b/a West River Granite Co." The schedule discloses gross sales of zero and a net loss of $4,508.08 arising from the following deductions claimed as business expenses: Garage Repair and Services
$1,102.27
Telephone & Electricity
201.67
Auto and Machine Parts and Supplies
1,429.00
Insurance
408.63
Auto Travel Expense
$ 271.00
Bank Service Charges and Check Ex- pense
62.96
Taxes
308.42
Professional Dues and Journals
204.10
Petty Cash Business Expenditures
26.20
Rent
99.50
Legal Expense
35.00
Depreciation [4] 355.33
$4,504.08
*72 1235 During or prior to 1963 petitioner borrowed $1,000 using his vehicles as collateral. This money was deposited in his personal checking account. Part of the $62.96 deduction depicted above and taken as "Bank Service Charges and Check Expense" is attributable to a $1 per month service fee which was deducted from the balance maintained in petitioner's bank account. The remaining portion of this deduction is attributable to $50.96 interest charges which arose from the $1,000 loan. The $201.67 deduction for "Telephone & Electricity" reflected the cost of maintaining a single telephone in the personal residence occupied by petitioner and his father. The telephone was listed under both of their names. Petitioner used this telephone for both business *73 and personal calls. The basic charge for use of the telephone was $5 a month, all other charges being toll calls. The differential between the $201.67 deducted on petitioner's return as telephone and electricity expense and the $165.11 expended on telephone calls appears to be for amounts spent for electricity on petitioner's residence. The $271 deduction for auto travel was computed on a basis of 15 cents per mile traveled. The travel giving rise to this expenditure was undertaken in petitioner's personal automobile. Of the amount deducted as "Taxes," $97.77 represented real estate taxes levied on the quarry by the town of Dummerston. Petitioner concedes that the treatment of this $97.77 amount as a deduction from his personal income constituted error on his part. Petitioner deducted the $4,504.08 (constituting the entire amount shown on Schedule C of his return) from his gross income for 1963 which consisted solely of his salary of $7,802.83. Respondent disallowed the entire deduction. Opinion Petitioner is an individual with many years of civil engineering experience. In 1955 he and a business associate formed the West River Granite Company, Inc., for the purpose of quarrying *74 and selling rock. The corporation thereafter acquired a quarry site, but was from the beginning handicapped because it lacked a practical means of access for the transportation of its rock. Petitioner, who since 1956 has been sole shareholder of West River, was not daunted by this dilemma. Beginning in 1957, petitioner painstakingly began to acquire in his name automotive equipment which he could use in the construction of a ford for his corporation which would, when constructed, give his corporation direct access to a nearby highway and shipping lane. Petitioner incurred sizable expenditures on the maintenance and upkeep of these vehicles, his expectation being that West River would be able to hire him to construct the ford as soon as it received a contract for the sale of rock. Until the date of trial, no such contract materialized. The issue which we must decide is whether for the year 1963 petitioner was correct in taking as a deduction from personal income some or all of the expenditures which were enumerated on Schedule C of his personal income tax return, all of which, he argues, arose from his ownership of the automotive equipment referred to above. We think petitioner *75 has established a convincing case for the deduction of some of these items. But only to the limited extent that the enumerated expenditures were proved to have been related to the management, conservation or maintenance [5] of the aforementioned vehicles, do we hold that petitioner's action in taking such 1236 expenditures as deductions from income (and, ultimately, as section 165(c)(2) losses) was proper. *76 In opposition to the deduction of these expenditures, respondent raises three arguments. First, it is contended that the claimed expenses are not deductible by petitioner because he lacked the requisite profit seeking motive; second, the expenditures constituted expenses of petitioner's wholly-owned corporation and were accordingly not deductible on petitioner's personal income tax return; and, finally, the claimed expenses were personal in nature and, therefore, not deductible under section 262 of the Code. We will consider these arguments one at a time in the order presented. Argument I Schedule C of petitioner's income tax return for the year in question treated the disputed expenditures as business deductions. There being no offsetting business income, the sum of these deductions was brought forward to page 1 of petitioner's return presumably as a section 165(c)(1) business loss. This "loss" was then applied against petitioner's income from employment, thereby reducing declared income by an amount equal to the adjustment in income which appears on respondent's notice of deficiency. At trial, the deduction giving rise to the claimed loss was neither characterized as a section *77 162 (business) deduction or a section 212 (nonbusiness) deduction - peitioner's counsel, in his opening statement, citing both section 162 and section 212. However, for the first time, on brief petitioner made it clear that the deductibility of the disputed expenditures was being sought on the ground they were incurred for the management, conservation or maintenance of property held for the production of income. See section 212(2). Since respondent, though not directly objecting to petitioner's delayed reliance on section 212(2), has expressed some dissatisfaction as to the timeliness of this argument, we deem it wise to dispose of this matter before we resolve the underlying question on the merits. Rule 7 of this Court's Rules of Practice requires, in part, that the petition contain clear and concise assignments of each and every error alleged. Sidney Messer, 52 T.C. 440, 455 (1969). Moreover, it is well settled that issues not raised by the pleadings, but argued for the first time on brief, should not be considered. William Greenberg, 25 T.C. 534 (1955). Petitioner's *78 petition contains, in pertinent part, the following assignment of error: The taxpayer rented a granite quarry in Vermont. He held the same for the production of income. During the taxable year of 1963, he incurred certain expenses, including depreciation on equipment in connection with the quarry, but realized no income. He sought to deduct these expenses against other salaried income not derived from his ownership of the quarry. The Commissioner has erroneously disallowed the deduction on the ground that the quarry venture was not entered into for a profit motive. We think it is clear from the above assignment of error that the gravamen of petitioner's case is centered on the question of whether, over the years and including 1963, the continuous expenditures which petitioner incurred on his automotive equipment were attributable to a profit making motive. [6] The specific question raised by the above pleading (i.e., whether or not a profit motive existed) is strikingly identical to the way respondent characterizes the major issue in this case when on brief he states: Respondent contends that petitioner is not engaged in a trade or business, because he lacks a profit motive and *79 therefore he is not entitled to deduct the losses in issue. * * * Although the record is not clear in the instant case as to what type of business petitioner claimed to be engaged in, the main thrust of this case turns on the question of whether petitioner had the requisite motive or intent of making a profit. * * * From the above, it can be seen that respondent's view of the case differs from the approach taken by petitioner's petition only in the degree of specificity with which respondent has characterized the type of 1237 deduction sought by petitioner. In both instances, viz. respondent's brief vis-a-vis petitioner's petition (as well as petitioner's opening statement on trial in which it was stated "the question for decision * * * is * * * [whether] the taxpayer's side venture [was] entered into for profit"), the pivotal question is whether or not petitioner entertained a profit making motive during the year in which the contested expenditures were incurred. Hence, as between the facts required to support the allegations set forth by petitioner in his petition (and which he sought to prove at *80 trial) and those relied upon by respondent in substantiation of the stance taken by him on brief, respondent is not in a position to claim surprise. However, in order to vouchsafe petitioner from the result reached in Greenberg, it must also be established that the facts necessary to support petitioner's assignment of error are so identical to those needed to support the theory of law advanced by petitioner on brief as to eliminate any possibility of prejudice to the respondent. We believe no prejudice has here occurred. [7]
*81 Returning to the merits, we believe petitioner possessed the profit making motive which respondent has characterized as being central to the resolution of this case. Respondent argues that petitioner lacked such requisite intent because petitioner was unable to show a profit in his questioned activities for each of the eight years preceding the year in question. (See footnote 2, supra.) Citing the fact that for each of the years 1955-1963 petitioner's income from nonemployment activities was negligible when compared with the expenditures incurred by petitioner in maintaining and repairing his automotive equipment, respondent urges that, at most, petitioner harbored a vain hope that he might someday realize a profit, Louise Cheney, 22 B.T.A. 672, 674 (1931), and that, at last, petitioner's motives were those of personal pleasure, Cecil v. Commissioner, 100 F. 2d 896 (C.A. 4, 1939), reversing in part and affirming in part 37 B.T.A. 904 (1938). We cannot accept respondent's position. We believe petitioner harbored more than just a vain hope of making a profit. At the time petitioner began investing in and repairing the automotive equipment *82 in question, he had already committed $6,000 to a corporation (West River) whose activities he hoped would one day necessitate the employment of this equipment for the construction of a ford which was desperately needed by the corporation. The corporation had piles of rock readily available for sale and petitioner sincerely believed that just one contract for the sale of rock might bring in as much as $90,000 or $100,000 - more than that which would be needed to hire petitioner's equipment for construction of the ford. Petitioner had been informed by a local bank that it would loan the corporation sufficient funds to hire petitioner if only the corporation could produce a bona fide contract for the sale of rock. However, fate seemed to be against West River and West River was, for all the years in question, unable to produce a contract. This discouraging commentary was, moreover, in no way attributable to the absence of a readily available market for West River's rock. To the contrary, road construction was continuously taking place in close proximity to West River. Even at the time of trial West River was negotiating with a highway contractor who had been engaged to work on a nearby *83 stretch of highway. The bane of West River's and petitioner's problems was lack of an access route to one of the nearby transportation channels. Though hindsight reveals the insurmount-ability of this problem, we cannot say that petitioner's expectation in 1963 that it would at sometime be conquered constituted hope so groundless as to be characterized "vain." In so holding, we also reject respondent's alternative argument that petitioner's 1238 activities with regard to the vehicles in question were pleasure motivated. The regulations under section 212 state in pertinent part: The question whether or not a transaction is carried on primarily for the production of income or for the management, conservation, or maintainance of property held for the production or collection of income, rather than primarily as a sport, hobby, or recreation, is not to be determined solely from the intention of the taxpayer but rather from all the circumstances of the case. * * * We think it clear that the surrounding facts in this case support petitioner's contentions as opposed to those of respondent. *84 To begin with, we are not here dealing with an activity which a casual glance would reveal as being potentially pleasurable. The expenditures in question were, in the main, attributable to repair and maintenance work performed by petitioner on heavy construction vehicles. With the possible exception of the 1948 automobile which petitioner purchased, we would be hard pressed to characterize petitioner's countless hours of work on these vehicles as a hobby. Try as we might, we cannot conjure up a picture of petitioner mirthfully driving his fully reconditioned 1948 GMC flatbed truck or 1948 FWD telephone pole truck along the countryside with nothing but pleasure on his mind. To hold otherwise would, we believe, be tantamount to kindling a flashfire in the hearth of reason. Nor may it be said that petitioner's work on these vehicles, though inherently profit motivated, must be viewed in a more restrictive light because petitioner enjoyed what he was doing. It matters not to us that petitioner may have derived enjoyment from the dozens of hours he spent working on these vehicles so long as his work was undertaken with a view to making a profit. [8]
*85 Argument II In his second argument, respondent requests that we disregard the separate taxpayer status of petitioner and West River so that the expenditures incurred by petitioner may be attributed to West River. [9] We cannot agree with the position taken by respondent. We believe that petitioner and West River were separate taxpayer entities and that petitioner, in his individual capacity, incurred the expenditures in question. [10]
It is well recognized that if the business activity of a taxpayer is a sham and unreal, the Commissioner may disregard its separate entity for tax purposes. It is also, however, well settled that a taxpayer may adopt *86 any form he desires for the conduct of his business and chosen form cannot be ignored merely because it results in a tax savings. Perry R. Bass, 50 T.C. 595, 600 (1968). What is of importance is that the form chosen by the taxpayer be a viable business entity; that is, it must have been formed for a substantial business purpose or must have actually engaged in substantive business activity. Moline Properties v. Commissioner, 319 U.S. 436 (1943). Thus, if the purpose of an entity (corporate or otherwise) is to carry out substantive business functions, or if it in fact engages in substantive business activity, it will not be disregarded for Federal tax purposes. Perry R. Bass, supra, at p. 601. In the case at bar, West River was organized by petitioner and a business associate in 1955. Articles of Association were filed with the State of Vermont and since 1956 West River has existed as a duly authorized corporation under the laws of Vermont. The mere fact of State authorization, we recognize, would not be enough for independent taxpayer status if the form employed for doing business amounted to a sham. See Higgins v. Smith, 308 U.S. 473 (1940), *87 and Aldon Homes, Inc., 33 T.C. 582 (1959). However, we believe that the facts of this case do not yield even a hint of sham. Even respondent admits on brief that "There was no showing by petitioner that the instant corporation was not formed for a valid business purpose. In fact the opposite is true." 1239 The Articles of Association of West River, which have been set out earlier in our findings of fact, state the purposes for which West River was organized. That the corporation, in pursuance of its charter, may have been able (if financially equipped) to perform functions undertaken by its sole shareholder (petitioner) or that its sole shareholder undertook activities which his corporation may have been empowered to perform, had the shareholder contributed the necessary funds to the corporation, is of no moment to us. What is important in this case is whether West River was formed for a substantial business activity. See Aldon Homes, Inc., supra, and cases cited therein at pages 596 and 597. We hold that West River was organized for a substantial business activity and that for all the years in question it existed independently of petitioner and in *88 readiness to perform such business activity. In so holding we do not overlook the fact that for most of the years in question petitioner was sole shareholder of West River and acted on its behalf as both its chief officer and sole shareholder. Such a phenomenon is not new to us. As far back as 1949, the Supreme Court observed that: Undoubtedly the great majority of corporations owned by sole stockholders are "dummies" in the sense that their policies and day-to-day activities are determined not as decisions of the corporation but by their owners acting individually. * * * National Carbide Corp., 336 U.S. 422, 433 (1949). This observation was preceded by the Supreme Court's analysis of the result reached by the Court of Appeals in which it was said that that lower appellate court acted correctly when it held that: when a corporation carries on business activity the fact that the owner retains direction of its affairs down to the minutest detail, provides all of its assets and takes all of its profits can make no difference tax-wise. * * * Today the rationale set out in National Carbide Corp. is well settled law. See e.g., Chelsea Products, Inc., 16 T.C. 840, 851 (1951), *89 affd. 197 F. 2d 620 (C.A. 3, 1952), and Perry R. Bass, supra. Nor do we believe that petitioner's mistreatment of 1962 and 1964 casualty losses (which arose partly from damage to petitioner's trucks and partly from damage to property belonging to the corporation), as items wholly deductible on his personal income tax return, represents proof positive of the identity of existence urged by the respondent. We believe such action by petitioner was an inadvertent mistake on his part, neither excusable nor damaging. What is clear, however, is that petitioner owned each vehicle in his personal capacity; sheltered them on premises which, in the main, were not owned by West River; personally took out contractor's insurance covering the vehicles wherever they were stored; and with his own money, rebuilt and repaired them to a level of operativeness. We think these facts carry the day for petitioner and warrant our conclusion that petitioner and West River were separate taxpayer entities and that the expenditures in question were incurred by petitioner in his individual capacity. [11]
*90 Argument III Respondent's final argument is that the expenditures enumerated in Schedule C of petitioner's tax return were personal in nature and, therefore, not deductible. We have stated earlier that these expenditures were properly deductible but only to the extent they were related to the management, conservation or maintenance of petitioner's income producing property - his vehicles. The burden of proving the amount of the items of expense which appear on Schedule C and that such items were related to section 212 type activities as opposed to section 262 type activities (as claimed by respondent) rests with the petitioner. To the extent described below, we hold that petitioner has failed to satisfy this burden. We first address ourselves to the following claimed deductions: "Garage Repair and Services"; "Auto and Machine Parts and Supplies"; "Professional Dues and Journals"; "Rent"; "Legal Expense" and "Depreciation." These items, if supported by the proof, would be deductible in full as expenditures arising from petitioner's profit seeking activities. Unfortunately, the evidence *91 produced by petitioner does not support such a finding. Petitioner's only evidence in substantiation of the amounts claimed to have been spent on these items consisted of several dozen canceled checks, 1240 some of which were readily identifiable with petitioner's section 212 type expenditures. Many, however, were made payable to entities or private persons whose activities did not appear to be or could not be determined to have been in any way connected with the expenditures claimed to have been made on behalf of petitioner's section 212 type activities. Hence, without additional evidentiary matter, such as invoices or customer receipts, we cannot say that petitioner has, to our complete satisfaction, proven his case. On our best judgment, therefore, we conclude that petitioner has carried his burden with regard to only the items and amounts shown below: Garage Repair and Services
Auto and Machine Parts and Supplies
$ 472.43
Professional Dues and Journals
54.00
Rent
99.50
Legal Expense
35.00
Depreciation 355.33
Total
$1,016.26
Additionally, though not connected with petitioner's profit seeking activities, the following expenditures for taxes and *92 interest charges were borne out by petitioner's canceled checks and are respectively deductible under sections 163 and 164 of the Code: Interest (described on Schedule C as "Bank Service Charges and Expense")
$50.96
Taxes 38.20
Total
$89.16
We now consider the deductions claimed for "Telephone and Electricity," "Auto Travel Expense," "Insurance" and "Petty Cash Business Expenditures." As to the deductions claimed for "Telephone and Electricity" and "Auto Travel Expense," petitioner contends that these expenditures arose from long distance phone calls and road trips which he made in an effort to locate and secure parts needed for his automotive equipment. However, petitioner has offered no proof in support of these contentions. Other than petitioner's unsupported statements, the record is barren of any testimony which would assist us in determining the extent to which petitioner's private telephone and private automobile were used to locate and retrieve parts needed for his income seeking activities. In the absence of such evidence, we have no recourse but to hold that the deductions for these two items must be denied in full. Though we have found, at an earlier *93 point in our opinion, that petitioner personally took out contractor's insurance on his vehicles, the deduction for "Insurance" is, nevertheless, denied in full on the ground that petitioner has failed to introduce proof which would enable us to apportion expenditures for insurance, as reflected by his canceled checks, between amounts expended for personal reasons and amounts expended for contractor's insurance. Nor do we feel that this is a proper situation for applying the rule laid down in Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). The deduction for "Petty Cash Business Expenditures" is totally lacking in substantiation and for this reason has also been denied in full. Decision will be entered under Rule 50. Footnotes
1. His largest potential customer was the Commonwealth of Massachusetts until in 1962 that state enacted conflicts of interest legislation which prohibited state employees from selling materials or providing services to that state. See ch. 268A Mass. Ann. Laws (1968). Ch. 268A was enacted in 1962 (Acts 1962, ch. 779, sec. 1), but did not take effect until May 1, 1963. Although Massachusetts had enacted a code of ethics without sanctions during 1961 (Acts 1961, ch. 610, sec. 1), it is uncertain whether any of the standards of conduct enumerated therein would have applied to petitioner.↩
2. For the years enumerated below petitioner reported the following income and expenses on Schedule C of his income tax return:
↩
Year
Income
Expenses
Net OperatingLosses
1956
$ 29.00
$ 1,164.87
$ (1,135.87)
1957
31.00
1,379.13
(1,348.13)
1958
147.00
3,410.07
(3,263.07)
1959
0
4,294.32
(4,294.32)
1960
0
5,478.84
(5,478.84)
1961
0
5,115.10
(5,115.10)
1962
285.00
8,078.91
(7,793.91)
1963 0
4,504.08
(4,504.08)
Total
$492.00
$33,425.32
[32,933.32)
3. For the years enumerated below, West River reported net operating gains and losses as follows: ↩
Year
TotalIncome
Expenses
Net OperatingGain or (Loss)
1955
$ 471
$ 1,078.65
[607.65)
1956
820
1,268.91
( 448.91)
1957
120
1,123.14
(1,003.14)
1958
1,870
617.06
1,252.94
1959
130
669.46
( 539.46)
1960
10
310.44
( 300.44)
1961
10
317.73
( 307.73)
1962
10
95.00
( 85.00)
1963 0
0
0
Total
$3,441
$5,480.39
[2,039.39)
4. Petitioner derived the depreciation deduction from the following schedule: ↩ *90 Depreciation Schedule
AutocarTruck
Trailer
AutocarTrac torandTrailer
Total
Date of Ac- quisition
1959
1961
1962
Cost or other basis
$700.00
$100.00
$976.67
Depreciation Allowance
$420.00
$40.00
$195.33
Method
S/L
S/L
S/L
Rate
5 yrs.
5 yrs.
5 yrs.
Deduction
$140.00
$ 20.00
$195.33
$355.33
5. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year - (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; * * * SEC. 165. LOSSES. * * * (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - * * * (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * * All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise designated.↩
6. See the table of expenditures set out in footnote 2, supra.↩
7. The progenitor to section 212(2) first appeared in the 1939 Code as section 23(a)(2). The legislative history of this 1939 Code provision and the case law which developed under it clearly shows that the then new provision was to be regarded as being comparable and in pari materia with section 23(a)(1), the precursor to section 162. Hence, it was stated by the Supreme Court: The effect of § 23(a)(2) was to provide for a class of non-business deductions coextensive with the business deductions allowed by § 23 (a)(1), except for the fact that, since they were not incurred in connection with a business, the section made it necessary that they be incurred for the production of income or in the management or conservation of property held for the production of income. * * * Being in pari materia, the considerations which underlie deductibility under either section are essentially the same, the major distinction being whether the expenses in question are related to the carrying on of a business (section 162) of the production of nonbusiness income (section 212). Deductions under either section, if in excess of related income, are deductible as losses under sections 165(c)(1) and 165(c)(2)↩, respectively.
8. See George W. Cutting, a Memorandum Opinion of this Court dated December 18, 1947, where it was stated: The fact that petitioner anticipated pleasure as well as profit from his * * * venture does not, of itself, prevent such a venture from being considered a business or preclude the deduction of losses therefrom. * * *↩
9. Since West River experienced negligible income during 1963 and in the years preceding and following this year, the net effect of such adjustment would be to foreclose both West River and petitioner from availing themselves of any tax deductions attributable to such expenditures. ↩
10. On brief, respondent concedes that section 482 is not applicable to this case. The contents of this section will, therefore, not be considered herein.↩
11. Section 482 having been conceded by respondent, we deem it unnecessary to consider certain "arm's-length" considerations arising from the amount of rent paid by petitioner to West River for use of the quarry property, except to note that the lease agreement did not provide for royalties, nor, apparently, the removal of rock from the quarry.↩